MARGARET MAUZY v. STATE OF NEBRASKA.

FILED OCTOBER 4, 1919.   No. 20975.

1. **Criminal Law:** INSTRUCTIONS. Where instructions given by the trial judge correctly respond to the evidence and issues raised, they will be held to have been correctly given.

2. ———: WITNESSES: CROSS-EXAMINATION. Whenever a defendant offers himself as a witness in his own behalf, he is subject to the same rules of cross-examination as any other witness. It rests, however, with the sound discretion of the trial judge as to how far opposing counsel may be allowed to go in his cross-examination, and, unless there was an abuse of discretion, no error has been committed. *Held*, that in the instant case the trial judge acted well within the limits of his discretion.

3. **Homicide:** EVIDENCE. The evidence in the present case examined, and *held* to sustain the verdict of the jury.

ERROR to the district court for Lancaster county: FREDERICK E. SHEPHERD, JUDGE. *Affirmed.*

J. C. McReynolds and *Herman N. Mattley*, for plaintiff in error.

*Clarence A. Davis, Attorney General, George W. Ayres* and *J. B. Barnes, contra.*

ALDRICH, J.

Margaret Mauzy, whom we will hereafter refer to as the defendant, rented room 25, at the west end of the hall on the third floor of a rooming-house at 510 North Fourteenth street, Lincoln. On the 11th day of November, 1918, she telephoned to Dr. Spear at his room in the Y. M. C. A. building, representing herself as Mrs. Wells who, was calling from the above-named room. In response to this call, Dr. Spear answered by calling at the rooming-house and going up, as Mrs. Mauzy alleges, to room 25 and rapping on the door. The defendant answered the call, and, after some little altercation between the two, Mrs. Mauzy drew her revolver and shot Dr. Spear four times, fatally wounding him. The cause of the altercation which resulted in the shooting was the failure, according to Mrs. Mauzy's statement, of Dr. Spear to settle with her a claim which she held against him in the sum of about $6,000; and, further, that in the course of the altercation Mrs. Mauzy claims that Dr. Spear, after inquiry as to who called him, and as to whom he would look for settlement, became enraged at Mrs. Mauzy deceiving him, and raised his medicine case up over his head as though to crush it down upon the head of defendant. When she saw him in this attitude, about to strike, she then drew the revolver and fired at him while they were in a position facing each other. She also alleges that she represented herself as Mrs. Wells to get the doctor to go there for the purpose of arranging with him to treat her mother. Mrs. Mauzy first went there in the forenoon and procured this room, and, having called Dr. Spear, lay down and took a nap until he should arrive. The defendant admits the shooting and the resulting death from the shots, but justifies the killing on the ground of self-defense.

This in the main is a statement of the material facts. The jury returned a verdict of murder in the first degree, but with a recommendation that the court impose

Mauzy v. State.

a sentence of life imprisonment, which the court accordingly did.

On the cross-examination the state inquired of defendant if she had gone under the name of Margaret Stabba, which she denied, and if she had gone under the name of Margaret Huffman, to which she replied she had a right to that name at one time. It is not disclosed whether she had ever been married to a man by that name or by what right she claimed the name. The state also asked if she went under the name of Carmen Calvert. She denied this, but admitted having received letters under that name. Defendant assigns this cross-examination as error, but we think that the defendant having testified in her own behalf became subject to the same rules of cross-examination as an ordinary witness. Error was not committed in the premises because the interrogations were apparently for the purpose of testing her credibility. The testimony was therefore both competent and material. *Hanoff v. State,* 37 Ohio St. 178; Underhill, Criminal Evidence (2d ed.) sec. 60; 2 Wigmore, Evidence, sec. 1006; 5 Chamberlayne, Modern Law of Evidence, sec. 3726; *Elliott v. State,* 34 Neb. 48.

The next error complained of is with reference to instruction No. 11½. The instruction follows: "It is proper for you to consider in this case that the defendant went to the room armed and awaited Dr. Spear armed when he came in answer to her call; and if you find beyond a reasonable doubt that she caused him to come into her presence, knowing or believing that he would become angry, and perhaps assault her, and meaning to shoot him if he did, then and in that case you should scrutinize her evidence as to self-defense with great care with a view of rightly determining the issues involved." The complaint is that the trial court "assumed the existence of a state of facts not admitted, and upon which no evidence was introduced." We do not think the court erred in giving the instruction.

Defendant represented herself as Mrs. Wells in calling Dr. Spear, because, as she explained, when he recognized her voice over the telephone he would pay no attention to the call. She also testified that Dr. Spear was a man of violent temper, and if he became angry he would very likely do her great bodily harm. In view of these facts, she was not justified in provoking an assault.

It may be noted that defendant admitted she went to the room with the revolver, and awaited the appearance of Dr. Spear, and removed it from her hand-bag and concealed it on her person. This is all admitted, and, after having shot him four times, she quietly and coolly fixed herself up, put the revolver back into her hand-bag, adjusted her hat and veil, and carefully prepared herself to go. The evidence shows she was the coolest and most unconcerned person of all those present; that she called the sheriff's office, or jail, and told him what had occurred, and at no time expressed any regret for what had happened.

When another person present started to call the police, she said, "This is not a police case; call the sheriff," showing deliberation. It will be noticed in this connection that the defendant came to room 25 carrying a revolver in her hand-bag, and that she removed the revolver some little time later and got it ready for action, concealing it upon her person when she went out to meet deceased. The defendent deliberately placed herself in a position, according to her testimony, necessary to insure her own safety, and then shot the deceased. This does not constitute justifiable homicide. It is in evidence, too, that defendant in substance said to Mrs. Knorr, on or about November 5, that if there was any more medicine she (Mrs. Knorr) needed she had better get it, as Dr. Spear would not be able to write prescriptions much longer, and that that time was not far distant. It is true she claims this remark was made in another relation; but in view of her conduct,

and what happened, it could only mean the shooting that followed on November 11. Immediately after the shooting, the defendant said: "I shot him with his own gun, and he knowed he had it coming." Further she remarked to another witness who was present right after the shooting and while Dr. Spear was complaining of the intense agony he was suffering from the shot through his arm: "Well, he will not break any more babies' necks with that arm." These remarks are calculated to strengthen the proposition that the defendant at the time of the shooting was deliberate and cool, and was carrying out a premeditated plan, and was satisfied that she had done a good job.

That situation did not support the theory that she was taken by surprise and was compelled to shoot to defend herself from great bodily injury. There is not a syllable in the record that would prove this was justifiable homicide. On the other hand, it was a deliberate and premeditated act by a desperate woman willing to go to any extreme to revenge herself for fancied wrongs. She was not afraid of Dr. Spear, because she said to a witness: "No; he has no arms; he would not hurt any one if he did have." The record clearly shows that the defendant way lying in wait for Dr. Spear with a revolver for the purpose of provoking a quarrel with him.

The nature of the wounds inflicted and the direction from which the impact occurred which caused the mortal wounds did not sustain the theory of the defendant that she shot deceased when face to face or but a short distance from him. Defendant testified that Dr. Spear called at her room and knocked, and that she in response thereto came to the door; that he was surprised to meet defendant; that he refused to come in; that she stepped outside and entered into conversation with him out of which grew the altercation, and she shot him four times, each shot taking effect.

It also appears of record that one A. J. Olson was rooming in close proximity to room 25 where the shooting took place, and that at the time his door was open and he could easily see everything that transpired, and in substance his evidence is that he heard no knocking at the door on the day of November 11, although the door of his room was open, and that no one else living near the room that Mrs. Mauzy occupied heard any knocking. Francis E. Kroben says that the deceased did not at any time prior to the call rap on the door of defendant, and the evidence of Dr. McKinnon as to the location of wounds shows conclusively that the shooting took place at the head of the stairway on the third floor. Defendant's evidence in respect to self-defense is not corroborated.

Francis E. Kroben says he was rooming, together with his family, in room 29, in the building where the tragedy occurred, and that he was present in his room together with his family at the time of the shooting; that he heard the doctor coming upstairs onto the third floor, and also heard the shots, five in number; that his room is something like 20 feet from the door of room 25; thought his room was also about 17 feet from the head of the stairs on the third floor; that, while sitting in his room, he heard a person in the stairway between the second and third floor, immediately before the shooting, heard the footsteps coming up the stairs, and then he heard the shots, and then the tumbling down the stairs. He went out into the hall, and, as he came out of the door upon hearing the shots, saw Mrs. Mauzy.

Dr. McKinnon performed an autopsy upon the body of Dr. Spear. According to the evidence of Dr. McKinnon, the wounds were not received by Dr. Spear when he was facing the defendant, but rather when he was retreating with his back turned toward her. This is proved absolutely by the perforations of the bullets at the side and the back.

One cannot determine by the selection of detached parts of instructions their true meaning and import, but they must be taken together as a whole and considered. The instructions complained of, to wit, 10, 11, 11½, and also 15 and 16, when taken together and viewed in the light of the facts in this case, and the law applicable thereto, are without prejudicial error. *Murphy v. State,* 15 Neb. 383; *Housh v. State,* 43 Neb. 163; *St Louis v. State,* 8 Neb. 405.

In *State v. Harris,* 1 Jones, Law (N. Car.) 190, a very carefully considered case is reported, in which it is said: "If the person charged with the homicide is to judge for himself whether this reasonable ground existed, the most atrocious murders may be committed with impunity. The prisoner says he believed his life was in danger. Who can look into his heart? If the law allows him to judge, who can contradict him? The circumstances are nothing. It is his belief that justifies him. The law is not so. It is only from circumstances accompanying the transaction that reasonable ground can be ascertained, and of their bearing and influence the jury are the sole judges."

This is the precise situation in the instant case. The jury weighed this evidence. They are the sole judges as to whether or not the defendant believed that an assault was to be made upon her that would cause great bodily harm, or injury, and the jury found against her. As said in the *Housh* case: "The principle which underlies the rule there stated is that human life should not be made to depend upon conditions so unreliable and hazardous as the bare belief of any man that he is in danger of death or bodily harm."

No prejudicial error appearing in the record, the verdict is

AFFIRMED.

SEDGWICK, J., not sitting.

ROSE, J., dissenting.

I am unable to concur in the approval of the cross-examination of defendant or in the charge to the jury.

LETTON, J., concurring in part.

The evidence of the crime is so plain and the testimony as to self-defense is so slight and unreliable that it seems to me the jury could not have reached any other conclusion than they did. But I think instruction No. 11½ should not have been given, and is erroneous, but is not prejudicial when considered in connection with all the other instructions, and with the evidence. I therefore concur in holding that the record does not require or warrant a reversal of the judgment.